S. Todd Neal (Bar No. 174827)
PROCOPIO, CORY, HARGREAVES &
    SAVITCH LLP
530 B Street, Suite 2100
San Diego, California  92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorney for Defendant
JOHN McTIERNAN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN McTIERNAN,<br><br>Defendant. | Case No.: 2:06-CR-00259-DSF<br><br>**DEFENDANT JOHN McTIERNAN'S NOTICE OF MOTION AND MOTION TO SUPPRESS PURSUANT TO 18 U.S.C. § 2515, OR, IN THE ALTERNATIVE, REQUEST FOR EVIDENTIARY HEARING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF S. TODD NEAL; NOTICE OF LODGMENT.**<br><br>Hearing Date: June 1, 2010<br>Time: 8:30 a.m.<br>Courtroom: 840<br><br>The Honorable Dale S. Fischer<br><br>Trial Date: July 13, 2010 |

PLEASE TAKE NOTICE THAT on June 1, 2010, at 8:30 a.m., or as soon thereafter as counsel may be heard in Courtroom 840 of the above-entitled Court located at 255 East Temple Street, Los Angeles, California, defendant John McTiernan will move this Court for an order suppressing the audio recording of communications between Anthony Pellicano and Mr. McTiernan occurring on August 17, 2000 and the fruits of those communications.   Alternatively,

1   Mr. McTiernan moves this Court for an evidentiary hearing on his motion to

2   suppress.

3        This motion is based on the accompanying Memorandum of Points and

4   Authorities, the attached declaration of S. Todd Neal, the accompanying Notice of

5   Lodgment, the court records and pleadings in the court files for this case, and on

6   any evidence and argument that may be presented to the Court at the hearing.

7

8                                        Respectfully submitted,

9   DATED:        April 26, 2010          PROCOPIO, CORY, HARGREAVES &
                                             SAVITCH LLP
10

11

12                                       By: /s/ S. Todd Neal
                                             S. Todd Neal
13                                           Attorney for Defendant JOHN
                                             McTIERNAN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I.   INTRODUCTION ............................................................ 1

II.  STATEMENT OF FACTS IN SUPPORT OF MOTION .............................. 5

    **A.**   Mr. Pellicano Admits that He Used the Client Recordings to Guide His Work and Manage His Client Relationships........................ 5

    **B.**   The Government's Reliance on the Client Recordings at Trial is Further Evidence of the Important Role the Recordings Played in Mr. Pellicano's Criminal Enterprise................................................. 7

    **C.**   Mr. Pellicano's Client Recordings Were Not Indiscriminately Made but Instead Were Purposely Made to Support the Criminal Enterprise .............................................................. 9

        1.   Mr. Pellicano did not indiscriminately record calls with clients.  If a recording was made, it was made purposely.......... 9

        2.   Mr. Pellicano secretly made the recordings without his clients' knowledge or consent:.................................................. 9

        3.   The recordings were made for the purpose of record keeping in furtherance of the criminal enterprise. Mr. Pellicano often had his staff prepare transcripts of his secret recordings:..................................................................... 10

        4.   Mr. Pellicano transferred the recordings of his calls with clients to an external hard drive for safekeeping: ................... 10

    **D.**   It is Clear that the Client Recordings Were Purposely Made by Mr. Pellicano to Support the Illicit Criminal Enterprise Because the Recordings May Have Been the Only Records of the Enterprise......................................................................... 12

III. ARGUMENT ........................................................................ 14

    **A.**   The Plain Language of Title III Requires Suppression of the Recording.................................................................. 14

    **B.**   There Are No Judicial Exceptions to Title III That Can Overcome the Plain Language Of The Statute.................................. 16

    **C.**   The Illegally Obtained Recording Should be Suppressed Because this Court Should Not Give Recognition to "Evidence" Obtained by Illegal Acts.................................................. 17

    **D.**   Similar to *Vest,* the Recording Should be Suppressed Because Mr. Pellicano Created it as a "Receipt" or Record............................ 20

    **E.**   Mr. McTiernan's Motion to Suppress Materially Differs from Other Suppression Motions Brought by Mr. Pellicano's Alleged Co-Conspirators.................................................................. 22

    **F.**   Mr. Pellicano Recorded his Clients to Create Illegal Leverage Over Them and to Have Information to Trade/Sell to Tabloids ........ 23

i

IV.    REQUEST FOR EVIDENTIARY HEARING ............................................. 24

      **A.**    Alternatively, if the Court is Not Inclined to Grant this Motion Based on the Evidence Submitted, Mr. McTiernan Respectfully Requests an Evidentiary Hearing ....................................................... 24

V.    CONCLUSION .......................................................................................... 25

ii

1
2
## TABLE OF AUTHORITIES
3
**Page(s)**
4
### FEDERAL CASES
5

*Bell v. Hood*
6
    327 U.S. 678 (1946) ..................................................................................... 19
7
*Chandler v. United States Army*
8
    125 F.3d 1296 (9th Cir. 1997) .......................................................... 15, 16, 17
9
*Connecticut Nat'l Bank v. Germain*
    503 U.S. 249 (1992) ..................................................................................... 19
10
*Gelbard v. United States*
11
    408 U.S. 41 (1972) ..............................................................................passim
12
*In re Grand Jury*
    111 F.3d 1066 (3rd Cir. 1997) ..................................................................... 17
13
14
*Olmstead v. United States*
    277 U.S. 438 (1928) ..................................................................................... 18
15
*Schmuck v. United States*
16
    489 U.S. 705 (1989) ....................................................................................... 3
17
*Sherman v. United States*
    356 U.S. 369 (1958) ..................................................................................... 18
18
19
*Sussman v. American Broadcasting Cos.*
    186 F.3d 1200 (9th Cir. 1999), cert. denied, 528 U.S. 1131 (2000) .................................. 2, 15
20
*Traficant v. Comm'r*
21
    884 F.2d 258 (6th Cir. 1989) ....................................................................... 15
22
*United States v. Crabtree*
23
    565 F.3d 887 (4th Cir. 2009) ............................................................ 17, 18, 19
24
*United States v. Dale*
    991 F.2d 819 (D.C. Cir. 1993) .................................................................... 15
25
*United States v. Giordano*
26
    416 U.S. 505 (1974) ..................................................................................... 16
27
*United States v. Lam*
    271 F. Supp. 2d 1182 (N.D. Cal. 2003)...............................................passim
28

*United States v. Mavroules*
  813 F.Supp. 115 (D. Mass. 1993)............................................................25

*United States v. Moran*
  482 F.3d 1101 (9th Cir. 2006) ...................................................................3

*United States v. Murdock*
  63 F.3d 1391 (6th Cir. 1995) ..............................................................16, 17

*United States v. Nietupski*
  731 F. Supp. 881 (C.D. Ill, 1990) ............................................................25

*United States v. Phillips*
  540 F.2d 319 (8th Cir. 1976)...................................................2, 15, 24, 25

*United States v. Rose*
  526 F.2d 745 (8th Cir. 1975) ....................................................................25

*United States v. Smith*
  893 F.2d 1573 (9th Cir. 1989) ..............................................................3, 20

*United States v. Vest*
  639 F.Supp. 899 (D.Mass. 1986).............................................15, 20, 21, 22

*United States v. Vest*
  813 F.2d 477 (1st Cir. 1987) ...............................................17, 18, 21

*United States v. Zarnes*
  33 F.3d 1454 (7th Cir. 1994) ....................................................................15

## CALIFORNIA CASES

*People v. Otto*
  2 Cal. 4th 1088 (1992)...............................................................................16

## FEDERAL STATUTES

18 U.S.C.
  §§ 251 1(2)(d) and 2515 ("Title III") ........................................................2
  § 1001 ..........................................................................................................1
  § 2511(1)(a) ...............................................................................................14
  § 2511(2)(d) .........................................................................................15, 16
  § 2515 ..................................................................................................passim

## OTHER AUTHORITIES

Fed. R. Evid.
  804(b)(3)......................................................................................................7
  807 ...............................................................................................................7

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Counts 1 and 2 of the First Superseding Indictment allege that Defendant John McTiernan ("Mr. McTiernan") made false statements to a federal agent on February 13, 2006.  On that date Mr. McTiernan received a telephone call from FBI Special Agent Stanley Ornellas.  The Government alleges that Mr. McTiernan was asked if he had knowledge of wiretapping by Anthony Pellicano ("Mr. Pellicano") and whether he had previously discussed wiretapping with Mr. Pellicano.  The Government alleges that Mr. McTiernan denied such knowledge or prior discussions and that his responses were false, in violation of 18 U.S.C. § 1001, False Statements.  *See* Counts 1 and 2, First Superseding Indictment.[1]

The telephone call was Mr. McTiernan's first contact with Special Agent Ornellas, who said that he was calling regarding Mr. Pellicano.  The exclusive "evidence" which caused Special Agent Ornellas to contact Mr. McTiernan is a *single* audio recording which purportedly reflects a telephone communication between Mr. Pellicano and Mr. McTiernan occurring on August 17, 2000 (hereinafter referred to as the "Recording").  The Recording was surreptitiously recorded by Mr. Pellicano *without the knowledge or consent* of Mr. McTiernan.  Ironically, the Recording reveals that Mr. Pellicano demanded assurances from Mr. McTiernan that no other person was listening on Mr. McTiernan's side of the call.  Despite his insinuation that they were having a confidential communication, Mr. Pellicano secretly recorded the conversation and stored the audio tape on a computer in his office.  Accordingly, the Recording is a two party communication that was recorded with the consent of only one party.

Indisputably, the charges against Mr. McTiernan arise from the illegally made Recording.   The Recording was seized by the Government from

---

[1]  In a separate motion Mr. McTiernan moves for consolidation of Counts 1 and 2 based on multiplicity.  That motion is made on the grounds that Counts 1 and 2 refer to a single offense charged in multiple counts, in violation of, *inter alia*, the double jeopardy clause of the Fifth Amendment to the U.S. Constitution.

1

Mr. Pellicano's computer pursuant to a search warrant executed on Pellicano Investigative Agency, Ltd. ("PIA"). *See* Ex. 1 to Declaration of S. Todd Neal. *But for* the Government's discovery of the illegal Recording, the interview of Mr. McTiernan would not have occurred.

A single-party consent recording is inadmissible in a federal criminal trial if one of the purposes for the recording is criminal or tortious. 18 U.S.C. §§ 2511(2)(d) and 2515 ("Title III"). *United States v. Lam*, 271 F. Supp. 2d 1182 (N.D. Cal. 2003). Even if there is a legitimate purpose for the recording, an additional criminal or tortious purpose requires suppression. *Sussman v. American Broadcasting Cos*., 186 F.3d 1200 (9th Cir. 1999), cert. denied, 528 U.S. 1131 (2000). To prevail on this motion, Mr. McTiernan only has to prove by a preponderance of the evidence that Mr. Pellicano made the Recording for at least one criminal or tortious purpose. If this burden is met, the Government is precluded from using the Recording at trial. *See United States v. Phillips*, 540 F.2d 319, 327 (8th Cir. 1976).

Here, the evidence presented during Mr. Pellicano's two trials before this Court in 2008 conclusively shows that Mr. Pellicano had numerous criminal or tortious purposes for recording his own clients, including Mr. McTiernan.[2] Mr. Pellicano's conviction on seventy-eight (78) separate criminal counts including but not limited to RICO, RICO conspiracy, interception of wire communications, and manufacturing and possessing a wiretapping device, involved significant testimony from former employees of PIA and former clients of PIA. These witnesses provided first hand knowledge regarding Mr. Pellicano's method of secretly recording his telephone communications with clients and his *purpose* for making the recordings. This testimony was provided by witnesses such as Tarita Virtue, Lilly LeMasters, and Susan Maguire, among others. In summary, their

---

[2] The "first" Pellicano trial (approximate dates 3/3/08-4/30/08) is hereinafter referred to as "Pellicano Trial I" and the "second" Pellicano trial (approximate dates 7/16/08-8/29/08) is referred to as "Pellicano Trial II." During Pellicano Trial I the Government played twenty-six (26) excerpts of recorded conversations between Mr. Pellicano and his clients.

testimony established that Mr. Pellicano (a) only recorded specific calls, he did not record all calls; (b) he not only took deliberate actions to record communications with his clients, including Mr. McTiernan, he also took affirmative steps to preserve and encrypt those communications; and (c) he *made* and *used* the recordings as a *record-keeping mechanism.*[3]

The purposely made client recordings provided Mr. Pellicano with a vital record of the material terms of his illegal activities on behalf of clients: details of payment, specifics of assignments, confirmation of information furnished to clients, a checklist of work to be done, etc. Furthermore, the evidence confirms that the recordings guided his illegal activity on behalf of clients and the recordings were made for that specific purpose. Such a purpose was fundamentally criminal, by definition, in that the recordings facilitated, furthered, and advanced Mr. Pellicano's criminal activities and were, therefore, *criminal in purpose.*

The Ninth Circuit has repeatedly held, in numerous contexts, that record keeping is a function that furthers a criminal enterprise or conspiracy. *See*, e.g., *United States v. Smith*, 893 F.2d 1573, 1575-78 (9th Cir. 1989)(personal calendar used as a ledger to record drug transactions was maintained for the purpose of furthering the criminal enterprise); *United States v. Moran*, 482 F.3d 1101, 1108 (9th Cir. 2006)(maintaining of computer records in a tax conspiracy found to be in furtherance of conspiracy). Even mailings or wire communications that are not independently false or deceptive can be deemed to have been made for a criminal purpose. *See* Ninth Circuit Model Jury Instructions (Criminal) 8.101, 8.102, 8.103; *See also Schmuck v. United States*, 489 U.S. 705, 715 (1989)(even ostensibly benign mailings can be deemed to have been made for a criminal purpose).

But Mr. Pellicano's purpose for recording his communications with clients

---

[3] In addition to the trial testimony, there are also several FBI 302 Reports reflecting witness interviews of other former PIA employees who confirm Mr. Pellicano's criminal purpose for recording his own clients. These former PIA employees include Wayne Reynolds, Stacy Joiner, Linda Bottlik, Tracy Martin and Andrea Metz. Their FBI 302 Reports are being attached as exhibits and will be discussed within the Argument section of this Memorandum.

3

goes beyond simply facilitating or aiding his criminal activities as the client recordings were not merely oral checklists or verbal receipts.  Instead, if the client recordings are considered in relation to the entirety of the evidence, *this really was* the "record keeping of a criminal enterprise" because the client recordings may have been, in effect, the *only* "records" of Mr. Pellicano's RICO conspiracy.  The trial evidence established that PIA had two distinct sides: while some legitimate investigation services were provided, there was also a significant illicit operation -- the racketeering component -- that performed illegal investigation services on a continuing basis.  In fact, the Government argued that the "criminal enterprise" operated under a veneer of legitimacy provided by PIA's legitimate side and thus PIA served as a "cover" for the illicit operation.  The illicit services provided by the covert side of PIA included (alleged) wiretapping, unauthorized computer access, extortion, witness intimidation, etc.

Clearly, the trial evidence proved that the volume of illicit services was substantial and the racketeering operation was generating sizable revenues from a large number of clients (each of whom had unique issues and requirements).  Yet a review of the evidence -- including more than 32,000 pages of discovery produced by the Government and the transcripts from both trials -- reveals an astonishing fact.  Even though the racketeering operation was a substantial portion of the "work" being done at PIA, the client recordings were, in effect, the *only* records of the illicit criminal enterprise to be offered in evidence during Mr. Pellicano's two trials.  To prove the RICO enterprise the Government relied almost exclusively on the secret client recordings (as opposed to e-mails, notes, invoices, contracts, records of work performed for clients, billing information, etc.).  Considering the multiple searches of PIA's offices, including PIA's computers and electronic media, it is significant to the sole issue of this motion that the client recordings were the *only* records of the illicit criminal enterprise.

This compelling fact illuminate Mr. Pellicano's *purpose* in making the client

---

4

1    recordings: the recordings were made as *his* record of his criminal enterprise.

2    Furthermore, the evidence shows that he used the recordings to operate the illicit

3    enterprise, manage the illicit work and manage the associated clients.

4    Mr. Pellicano was the organizer and leader of the enterprise (according to the

5    Government), and managing all of the different clients with their different

6    requirements, unique facts and differing payment arrangements created an

7    organizational challenge.  Yet we have no evidence of invoices, contracts, billing

8    history, written client communications, or written records regarding work

9    performed.  Instead, the client recordings are the only "records" of the criminal

10   enterprise.  It cannot reasonably be stated that Mr. Pellicano operated so large an

11   illicit business from his head, relying only on memory, with no client memoranda,

12   notes, billing history or records of work performed.  That makes no sense and is not

13   plausible.  Much more likely is that Mr. Pellicano recorded his clients, including

14   Mr. McTiernan, as *his* record of his criminal enterprise and he used the recordings

15   to guide his work and operate the enterprise.  Accordingly, because the evidence

16   shows that it is more likely than not that Mr. Pellicano made the Recording for a

17   criminal or tortious purpose, pursuant to the plain language of Title III

18   Mr. McTiernan respectfully seeks a suppression order precluding the Government

19   from using the Recording at trial.

20   **II.    STATEMENT OF FACTS IN SUPPORT OF MOTION**

21   **A.    Mr. Pellicano Admits that He Used the Client Recordings to Guide
22          His Work and Manage His Client Relationships**

23        Of course, the best evidence of Mr. Pellicano's purpose for recording his

24   clients comes directly from Mr. Pellicano.  During opening statements in Pellicano

25   Trial I, while acting as his own counsel Mr. Pellicano explained why he recorded

26   his clients:

27              Mr. Pellicano, during the course of his endeavors and
             work, would have a minimum of 50 phone calls a day.
28           And during that — during those phone calls there would
             be calls from people that he was investigating, from
             clients and other individuals that he needed to keep

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> constant contact with. Now, *he decided to record those conversations for — you know, for inventory; for safekeeping; for, in effect, to remind himself of what he needed to do and what a client professed a need to have*, and thought, well, the best way to do that is to have a program to do that, to record those conversations in an encrypted fashion so that no one else but Mr. Pellicano could listen to those recordings ever.

(Ex. 2 to Neal declaration, 3/6/08 Transcript, p. 33 lines 8-21 emphasis added).

Mr. Pellicano's statement as to his purpose for recording calls, including calls with clients, verifies that the recordings were used to guide and facilitate the activities of the RICO enterprise. His selection of words describing his purpose is informative: "for inventory … for safekeeping … to remind himself of what he needed to do and what a client professed a need to have." These words are not indicative of taping that was done as a meaningless habit that had no purpose. Instead, the client recordings were purposely made to provide Mr. Pellicano with a mechanism to manage and lead the enterprise. By his own account, the client recordings provided him with an inventory or reminder of future work. Therefore, the client recordings were purposely created as a record keeping exercise in furtherance of the criminal enterprise. This is a criminal purpose.

For purposes of this motion, Mr. Pellicano's explanation of why he recorded his clients is admissible and should be considered by the Court. In fairness, it would be legal folly to ignore Mr. Pellicano's own admission regarding *his purpose* for recording his own clients, especially when that is the pivotal issue presented by this motion. While Mr. Pellicano's opening statement could not have been considered by the jury as evidence in his trial, that limitation derives from a model jury instruction, not the Federal Rules of Evidence. Additionally, the limitation is specific to a jury trial setting. There is nothing in the law that prohibits the Court from considering Mr. Pellicano's statement in determining whether it is more likely than not that Mr. Pellicano recorded Mr. McTiernan for a criminal or tortious purpose.

Mr. Pellicano's statement as to his purpose for recording calls with clients is

non-hearsay and properly admitted as an admission and/or authorized admission (based on Mr. Pellicano serving as his own counsel). However, even if deemed hearsay, the statement is admissible as a statement against interest under Fed. R. Evid. 804(b)(3). Additionally, the statement satisfies the residual hearsay exception recognized by Fed. R. Evid. 807, to wit:

(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. Fed. R. Evid. 807.

Here, Mr. McTiernan's counsel repeatedly sought a declaration from Mr. Pellicano to support this motion but he has received no response. (Neal declaration at ¶ 41). Presumably, after refusing to testify during two criminal trials, Mr. Pellicano continues to assert his 5th Amendment privilege while his appeals are pending. Under these facts, Mr. Pellicano's statement presents a textbook instance warranting application of Federal Rule of Evidence 807. The statement is offered as evidence of a material fact; it is more probative on the point than any other evidence Mr. McTiernan can reasonably procure; and admission of the statement is consistent with principles such as furthering the administration of justice by considering all reasonably reliable evidence in adjudicating cases.

**B.     The Government's Reliance on the Client Recordings at Trial is Further Evidence of the Important Role the Recordings Played in Mr. Pellicano's Criminal Enterprise**

During Pellicano Trial I, in its case-in-chief the Government played twenty-six recordings made by Mr. Pellicano representing telephone calls he had with various clients, including the Recording that Mr. Pellicano secretly made of his call with Mr. McTiernan.[4] The Government's reliance on the client recordings makes it

---

[4] The clients included Charles Lull, Adam Sender, George Kalta, Jennifer Megarry, Andrew Stevens, Chris Rock, Mark Cohn, Kenneth Starr, Leo Portcarrero, Suzan Hughes, Taylor Thomson, Michael Ovitz.

Case No.: 2:06-CR-00259-DSF

difficult to fathom that there can now be any legitimate argument that the recordings were not an essential part of Mr. Pellicano's RICO enterprise. The Government also relied heavily on Mr. Pellicano's secret client recordings during Pellicano Trial II. During many days of trial the jury listened to lengthy recordings, often consuming more time than the presentation of live testimony. In total, four hundred and ninety-one (491) pages of the transcript of Pellicano Trial II were devoted to the Government playing recordings that Mr. Pellicano secretly made of his communications with Mr. Christensen. (Neal declaration at ¶ 42).

The Government used Mr. Pellicano's secretly made client recordings as the framework for its presentation of evidence and as its bedrock of proof. The Government quoted from the recordings in opening statement, repeatedly played the recordings in its presentation of evidence and then played certain recordings again during closing argument. The Government repeatedly urged the juries in both trials to recognize that the details of the illicit activity were acknowledged and agreed to in the recordings (e.g. "don't take my word for it, listen to their words"). That was the blueprint for trial to prosecute Mr. Pellicano and his co-conspirators and it succeeded. It succeeded because the recordings *do* confirm the details of the illicit activity.

Because the recordings evidence a consistent and formulaic approach by Mr. Pellicano, it should be inferred that he had a specific purpose in making the secret recordings (and it was a criminal purpose). His purpose was to create a record (a) establishing the amount the client agreed to pay (after being strong-armed); (b) confirming the client's vow of secrecy; (c) obtaining the details of the illegal assignment; and (d) creating leverage over the client with an incessant 'con artist' routine that relied on crude psychological manipulation. In his own words, Mr. Pellicano recorded these interchangeable client communications to create an "inventory" or record to "remind himself of what he needed to do." That was a criminal purpose because the recordings were intended to further his criminal

1    enterprise.

2        **C.    Mr. Pellicano's Client Recordings Were Not Indiscriminately Made but Instead Were Purposely Made to Support the Criminal Enterprise**

3

4        Substantial evidence indicates that Mr. Pellicano's client recordings were not

5    made by meaningless routine or happenstance.  The opposite is true as he took a

6    series of calculated steps designed to secretly create the recordings, followed by

7    another series of premeditated steps to preserve, encrypt and conceal the

8    recordings.  A sampling of this evidence includes the following:

9        1.    Mr. Pellicano did not indiscriminately record calls with clients.

10   If a recording was made, it was made purposely.

| Source | Evidence |
|---|---|
| Trial Testimony of former PIA Employee Tarita Virtue, Ex. 3 to Neal declaration. | Mr. Pellicano "didn't have a practice of recording everything, he only recorded specific [calls]."  He would activate the recording with a switch by his telephone. |
| Trial Testimony of former PIA Employee Lily LeMasters, Ex. 4 to Neal declaration. | Mr. Pellicano "flipped the switch" next to his telephone or Ms. LeMasters flipped the switch for him when he wanted to record a call with a client. |
| Trial Testimony of former PIA Employee Lily LeMasters, Ex. 5 to Neal declaration. | Mr. Pellicano "sometimes" recorded calls with clients, he did not record all calls. |
| FD-302a Report re former PIA Employee Andrea Metz, Ex. 6 to Neal declaration. | Ms. Metz personally observed Mr. Pellicano recording his own telephone calls. |
| FD-302a Report re former PIA Employee Wayne Reynolds, Ex. 7 to Neal declaration. | Mr. Reynolds knew from personal observation that Mr. Pellicano made a practice of recording his own telephone conversations. |

25       2.    Mr. Pellicano secretly made the recordings without his clients'

26   knowledge or consent:

| Source | Evidence |
|---|---|
| FD-302a Report re Lily LeMasters, Ex. 8 to Neal declaration. | Ms. LeMasters was not aware of Mr. Pellicano ever advising clients that |

9

| | he was recording their communications. |
|---|---|
| Trial Testimony of Matt Williams, Ex. 9 to Neal declaration. | Q. [By Mr. Saunders] Mr. Williams, did you know at the time you were having that conversation that it was being recorded? <br> A. No. |
| Trial Testimony of Adam Sender, Ex. 10 to Neal declaration. | Q. [By Mr. Saunders] Mr. Sender, by the way did you know that Defendant Pellicano was recording you? <br> A. I did not. |

3.      The recordings were made for the purpose of record keeping in furtherance of the criminal enterprise.  Mr. Pellicano often had his staff prepare transcripts of his secret recordings:

| Source | Evidence |
|---|---|
| Trial Testimony of Tarita Virtue (3/12/08), Ex. 11 to Neal declaration; Trial Testimony of Tarita Virtue (7/23/08), Ex. 12 to Neal declaration. | On occasion, Mr. Pellicano instructed Ms. Virtue to prepare a transcript of his recorded call with a client. |
| FD-302a Report re former PIA Employee Linda Bottlik, Ex. 13 to Neal declaration. | Mr. Pellicano instructed Ms. Bottlik to prepare transcripts of his recorded calls with clients. |
| FD-302a Report re former PIA Employee Tracy Martin, Ex. 14 to Neal declaration. | Ms. Martin's primary duties were in Mr. Pellicano's audio laboratory transcribing taped conversations. Mr. Pellicano made a practice of recording his own telephone conversations. |

4.      Mr. Pellicano transferred the recordings of his calls with clients to an external hard drive for safekeeping:

| Source | Evidence |
|---|---|
| Trial Testimony of Tarita Virtue (7/23/08), Ex. 15 to Neal declaration. | Mr. Pellicano transferred his recorded conversations to an external hard drive. |

Objectively, Mr. Pellicano's course of conduct with respect to his client recordings confirms that the recordings were critical, at least in his mind, to the operation of the criminal enterprise.  Additionally, the evidence confirms that Mr. Pellicano was unwilling to create written records relating to his illicit activity

116229/000001/1198522.02

1  and, therefore, he *made* and *used* the recordings as a *record-keeping mechanism.*

2  This is proven by Mr. Pellicano's recorded communications with clients.   For

3  example, in a conversation with Charles Lull wherein Mr. Pellicano demanded an

4  additional $100,000.00 that Mr. Lull contended had not been agreed to,

5  Mr. Pellicano stated: "No, listen to me … you have to understand something.  I

6  don't put together contracts *for things like this*."  (Trial Transcript (3/20/08), Ex. 16

7  to Neal declaration).  Another example of the record keeping function served by the

8  recordings comes from a recorded communication with client Jennifer Megarry.

9  Mr. Pellicano explained why he did not send written invoices or statements for his

10  illicit operations: "If you just retain me with no paperwork, they don't know what

11  you hired me for.  You could be hiring me for guard service … You know if I send

12  you a statement, I have to say on the statement what it's for."  (Trial Transcript

13  (4/04/08), Ex. 17 to Neal declaration).

14       Mr. Pellicano's illicit operation did not rely on written records.  In place of

15  written records, the evidence establishes that it is more likely than not that

16  Mr. Pellicano recorded his clients to guide his work and operate the enterprise.

17  Accordingly, Mr. Pellicano had a criminal intention and criminal purpose in

18  making the client recordings.

19       Because the sole issue presented by this motion is Mr. Pellicano's purpose

20  for recording communications with his clients (including Mr. McTiernan), it is

21  important to consider circumstantial evidence such as his mode of operation.  The

22  enterprise, no doubt, was predicated on Mr. Pellicano selling illegal services to

23  wealthy clients (that *was* the criminal enterprise).  To further the success of the

24  illicit   operation,   Mr. Pellicano   used   continual   manipulation   during   his

25  communications with clients in order to extract as much money from them as

26  possible.  This included recurring use of identical methods of manipulation (e.g.

27  "There's only two people in the world that know about this … I'm not supposed to

28  be telling you this stuff … You cannot say a word to anybody in the world about

---

11

116229/000001/1198522.02

1  what I just told you … I have been paying for this out of my own pocket … Send
2  me another $25,000 …").

3      Since there is no market or customary price for the "service" sold by
4  Mr. Pellicano, the fee he would receive was completely dependent on the mind set
5  of the client.  To him, a client was a mark, a target to be exploited.  Mr. Pellicano
6  spent a substantial amount of his time talking with and manipulating his marks.
7  The client recordings allowed him to track where he left off in his manipulation of
8  the client, i.e., what was the last lie, the last promise?  What was the client's mental
9  state when they last spoke?  The only logical inference is that the recordings
10 assisted him in tracking these necessary details, thereby furthering the criminal
11 enterprise.  Therefore, the client recordings were made for a criminal purpose.

12      **D.    It is Clear that the Client Recordings Were Purposely Made by
        Mr. Pellicano to Support the Illicit Criminal Enterprise Because
13      the Recordings May Have Been the Only Records of the
        Enterprise**

14

15 Despite at least four separate search warrants that were executed at PIA
16 (including all of the computer and electronic media seized), the Government found
17 very little evidence (if any) beyond Mr. Pellicano's secret client recordings.
18 Unequivocally, the results of the searches did not fulfill the expectations outlined
19 by the Government in the corresponding search warrant affidavits.  To establish
20 probable cause Special Agent Ornellas provided three separate affidavits
21 describing, *inter alia,* the basis for the requested warrants *and the items expected to
22 be seized*.[5]  In detailing the evidence the Government anticipated finding relating to
23 suspected illegal wiretapping, wire fraud, unauthorized use of computer equipment
24 and conspiracy, Special Agent Ornellas described how, based on his substantial
25 training and experience (including twenty-six years with the FBI and three years as
26 a private investigator), he expected to find the following evidence:

27          retainer agreements; contracts; invoices; billing/payment
            records; correspondence; letters; notes; e-mails; client
28          files containing retainer information indicating the

---

[5] FBI Special Agent R.T. Ballard, III, provided the affidavit supporting the fourth warrant.

Case No.: 2:06-CR-00259-DSF

116229/000001/1198522.02

1
2
                           identity of the client and the purpose for which the investigator was retained; records of work performed for clients, etc.

3
4
(Exs. 18-20 to Neal declaration, Search Warrant Affidavits of Special Agent Ornellas).

5

6

7

8

9

10

11

12

13

14

15

16

17
       Thereafter, the Government fully executed on the four search warrants and Special Agent Ornellas confirmed in his trial testimony that the Government seized "a great deal of documentation and computer equipment," including the seizure and search of "many computers." Special Agent Ornellas testified that the Government acquired a "virtual copy" of Mr. Pellicano's business operations. (Trial Transcript (4/18/08), Ex. 21 to Neal declaration). However, despite this accumulation of seized items, the Government found virtually none of the anticipated items to support its racketeering case. Exhibits 22-28 to the Neal declaration set forth the Government's property receipts and FD-302 reports pertaining to the searches of PIA's offices.[6] These exhibits confirm that the Government did not find the anticipated evidence relating to the illicit services provided by the covert side of PIA. Instead, the Government found the client recordings – the true and actual records of the criminal enterprise.

18

19

20

21

22

23

24

25

26
       It is self-evident that in an illegal business the creation of written records is often avoided. Mr. Pellicano confirmed that, to the extent possible, he avoided the creation of written records relating to his illicit activities (*See* Exs. 16-17). Instead, he created secret encrypted recordings that he transferred to a hard drive and stored. These recordings, which included the Recording involving Mr. McTiernan, were accessible only to Mr. Pellicano and hidden from all others. Furthermore, the client recordings demonstrate that Mr. Pellicano time and time again used the recorded client communications to confirm details that were of material importance to his

27

28
---
[6] Ex. 22 is FD-340, Property Receipts from Search dated 11/21/02; Ex. 23 is FD-340, Photographic Log of PIA Search dated 11/21/02; Ex. 24 is FD-302 of 11/21/02; Ex. 25 is FD-302 of 12/4/02; Ex. 26 is FD-340, Search Warrant Property Receipts dated 1/15/03; Ex. 27 is FD-302 of 3/23/03; Ex. 28 is FD-302 of 8/8/05.

Case No.: 2:06-CR-00259-DSF

116229/000001/1198522.02

criminal enterprise, such as:

    1.     Agreements regarding his fees;

    2.     Status reports on the progress of the illegal activity conducted on behalf of clients;

    3.     Discussions regarding work to be done;

    4.     Obtaining vows of secrecy from the clients

    5.     Developing leverage over clients by continuously making claims of influential contacts, favors he was owed, access to powerful people, etc., all of which was designed to allow Mr. Pellicano to exert psychological control over the client so that he could extract unconscionable and unlawful fees.

Mr. Pellicano systematically covered each of these specific areas, and recorded himself doing so, for the express purpose of bolstering and continuing the criminal enterprise.    Accordingly, the weight of the evidence proves that Mr. Pellicano had a criminal purpose for recording his clients, including Mr. McTiernan.

## III.   ARGUMENT

### A.   The Plain Language of Title III Requires Suppression of the Recording

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial … if the disclosure of that information would be in violation of this chapter."    18 U.S.C. § 2515.    Therefore, intercepted wire communications *must* be suppressed if they were obtained in violation of Title III.

Under Title III, all interceptions of communications are unlawful unless specifically authorized by its provisions. 18 U.S.C. § 2511(1)(a). The only provision that authorizes interception by private parties is section 2511(2)(d):

> It shall not be unlawful under this chapter ... for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication… unless such communication is intercepted *for the purpose of committing any criminal or*

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> *tortious act in violation of the Constitution or laws of the*
> *United States or of any State.*

18 U.S.C. § 2511(2)(d) (emphasis added).  Accordingly, Title III makes clear that a party to a communication who is not acting under "color of law" is not authorized to intercept the communication if the interception is "for the purpose of committing any criminal or tortious act …"  *Id.*  If a private party intercepts a communication for the purpose of committing a criminal or tortious act, the interception is unlawful and must be suppressed (along with its fruits).  *See Chandler v. United States Army*, 125 F.3d 1296, 1298 (9th Cir. 1997); *United States v. Lam*, 271 F. Supp. 2d at 1183.

In order to be entitled to suppression, Mr. McTiernan must only show by a preponderance of the evidence that the Recording was made for the purpose of committing a criminal or tortious act.  *United States v. Phillips*, 540 F.2d at 327; *United States v. Zarnes,* 33 F.3d 1454, 1469 (7th Cir. 1994); *United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993); *Traficant v. Comm'r*, 884 F.2d 258, 266 (6th Cir. 1989).  The focus is on whether the purpose for the interception, i.e., its intended use, was criminal or tortious.  *Sussman v. American Broadcasting Cos.*, 186 F.3d 1200, 1202 (9th Cir. 1999) cert. denied, 528 U.S. 1131 (2000).  However, it need not be shown that the sole purpose was criminal or tortious.  It is sufficient for a defendant to show that either the primary motivation was criminal or tortious, or that a determinative factor in the actor's motivation was to commit a criminal or tortious act.  *United States v. Dale,* 991 F.2d at 841-42, quoting *United States v. Vest,* 639 F.Supp. 899, 904 (D.Mass. 1986).  The Ninth Circuit has made clear that an interception can be made for a legitimate purpose and still be criminal or tortious so long as the primary motivation was criminal or tortious.  *Sussman v. American Broadcasting Cos.,* 186 F.3d at 1202.

In enacting Title III, Congress established a "comprehensive scheme for the regulation of wiretapping and electronic surveillance."  *Gelbard v. United States*, 408 U.S. 41, 52 (1972).  Since the statute's enactment in 1968, the Supreme Court

---

15

1   has repeatedly confirmed that the handful of exceptions provided in the statute are
2   the only circumstances in which covert interceptions of oral or wire
3   communications are permissible. *Id.* ("Except as expressly authorized in Title III, ...
4   all interceptions of wire and oral communications are flatly prohibited."); *See also*
5   *United States v. Giordano*, 416 U.S. 505, 514 (1974); *People v. Otto*, 2 Cal. 4th
6   1088, 1098-1112 (1992)(discussing federal and state courts' near unanimous
7   refusal to recognize new, unenumerated exceptions based on the plain language of
8   Title III).

9           Here, because Mr. Pellicano recorded his communication with
10  Mr. McTiernan for the purpose of committing a criminal or tortious act, Section
11  2511(2)(d) prohibits the government's use of the Recording at trial.  The evidence
12  shows that, more likely than not, Mr. Pellicano had at least one criminal or tortious
13  purpose in recording Mr. McTiernan.   This includes but is not limited to
14  Mr. Pellicano's criminal purpose in that he made and used the Recording as a
15  record-keeping mechanism intended to further his illicit operations.  If the court
16  concludes, as it should, that Mr. McTiernan has shown by a preponderance of the
17  evidence that Mr. Pellicano had at least one criminal or tortious purpose in making
18  the Recording, then the plain language of Title III requires suppression.

19  **B.    There Are No Judicial Exceptions to Title III That Can Overcome**
        **the Plain Language Of The Statute**

20
21          In other cases the Government has unsuccessfully argued for a judicially-
        created exception to Title III's statutory scheme. *See Chandler v. United States*
22
23  *Army*, 125 F.3d at 1302; *United States v. Lam*, 271 F.Supp. 2d at 1184-85.
24  However, the Ninth Circuit has explicitly rejected a "clean hands" or "innocent
    recipient" exception.  *See,* e.g., *Chandler v. United States Army*, 125 F.3d at 1302.
25
26  In *Chandler,* the Ninth Circuit rejected the Sixth Circuit decision of *United States*
    *v. Murdock,* 63 F.3d 1391 (6th Cir. 1995) which allowed introduction of evidence
27
    obtained by an illegal private wiretap where the government "took no part in the
28
    interceptions."  The *Chandler* decision reminds that Title III "makes illegal not

---

16

1    only unauthorized interceptions but also the disclosure and use of information

2    obtained through such interceptions." *Chandler v. United States Army*, 125 F.3d at

3    1302.[7]   Additionally, *Chandler* affirms that the Supreme Court has expressly

4    rejected the argument that "the invasion of privacy is over and done with" once the

5    interception has occurred. *Id.*, quoting *Gelbard v. United States*, 408 U.S. at 52.

6         In addition to the Ninth Circuit, the First, Third and Fourth Circuits have also

7    expressly rejected a "clean hands" exception. *See United States v. Vest*, 813 F.2d

8    477, 481 (1st Cir. 1987); *In re Grand Jury,* 111 F.3d 1066, 1079 (3rd Cir. 1997);

9    *United States v. Crabtree,* 565 F.3d 887, 892 (4th Cir. 2009).   In fact, the 6th

10   Circuit's decision in *Murdock* appears to be the only decision to read a "clean

11   hands" exception into § 2515, with all other circuit courts rejecting such an

12   exception. *United States v. Crabtree,* 565 F.3d at 889, 891 ("The statute seems to

13   clearly and unambiguously prohibit the use in court of improperly intercepted

14   communications; we simply see no gaps or shadows in the language that might

15   leave lurking a clean-hands exception.   Because the statute is clear and

16   unambiguous, our inquiry typically would start and stop with its plain language").

17   **C.    The Illegally Obtained Recording Should be Suppressed Because
         this Court Should Not Give Recognition to "Evidence" Obtained
18       by Illegal Acts**

19        Title III was enacted to serve two purposes: the need to protect individual

20   privacy by prohibiting unauthorized electronic communication interceptions and

21   the need to equip law enforcement with a weapon necessary to battle organized

22   crime.  Omnibus Crime Control and Safe Streets Act of 1968, *See* S. REP. No. 90-

23   1097, at 2153-58 (describing Title III goals of privacy protection and law

24   enforcement).   In essence, Title III's policy objective of privacy protection requires

25   courts to interpret § 2515 as a deterrent both to the perpetrator's disclosure of

26   illegal interceptions and to the innocent recipient's disclosure of illegal

27   ───────────────

28   [7] In *Chandler*, the Ninth Circuit found that the Army's use of taped conversations between officers supposedly engaged in an adulterous affair, which tapes were made by the spouse of one officer, was improper since (among other grounds) the investigators were specifically aware that the recordings were unlawfully intercepted. *Chandler v. United States Army*, 125 F.3d at 1302.

1  interceptions.  *See, e.g., United States v. Vest*, 813 F.2d at 481 (When a court

2  operates under a "clean hands" exception the court provides great incentive for

3  private parties to intercept communications illegally).

4       "Moreover, § 2515 serves not only to protect the privacy of communications,

5  but also to ensure that the courts do not become partners to illegal conduct: the

6  evidentiary prohibition was enacted also 'to protect the integrity of court and

7  administrative proceedings.'"   *Gelbard v. United States*, 408 U.S. at 51.   In

8  *Gelbard,* the U.S. Supreme Court denied the Government the ability to use

9  information obtained from an illegal wiretap when cross-examining a grand jury

10  witness.  After an exhaustive analysis of the legislative intent behind Title III, the

11  Supreme Court concluded that, importantly, the invasion of privacy does not cease

12  upon the conclusion of an illegal interception but continues with each subsequent

13  disclosure.  *Id.* at 51-52.  Additionally, Justice Douglas (concurring), described the

14  critical importance of trial courts abiding by the plain language of § 2515, even if it

15  allows certain defendants to avoid prosecution:

16            "In a government of laws, existence of the government
              will be imperiled if it fails to observe the law
17            scrupulously.  Our Government is the potent, the
              omnipresent teacher. For good or for ill, it teaches the
18            whole people by its example. Crime is contagious. If the
              government becomes a lawbreaker, it breeds contempt for
19            law; it invites every man to become a law unto himself; it
              invites anarchy."
20

21  *Id.* at 68, quoting *Olmstead v. United States,* 277 U.S. 438, 485 (1928).

22  Furthermore, "the federal courts have an obligation to set their face against

23  enforcement of the law by lawless means because public confidence in the fair and

24  honorable administration of justice, upon which ultimately depends the rule of law,

25  is the transcending value at stake."  *Sherman v. United States*, 356 U.S. 369, 380

26  (1958).

27       These important principles were reaffirmed in 2009 by the 4th Circuit in

28  *United States v. Crabtree.*   There, Mr. Crabtree received a twenty four month

18

1    sentence for violating the terms of his supervised release.   The Government

2    established some of the violations by introducing into evidence certain audiotapes

3    that were made by Mr. Crabtree's girlfriend, who secretly recorded his telephone

4    communications.   *United States v. Crabtree,* 565 F.3d at 888.   Over Mr. Crabtree's

5    objection, the district court admitted the secretly recorded audiotapes into evidence.

6    Thereafter, the 4th Circuit vacated the district court's judgment and, in remanding

7    the case, specifically held that the audiotapes were not admissible.   Reasoning that

8    the protection of privacy was an overriding congressional concern when Title III

9    was enacted, the court stated: "We have stated time and again that courts must

10   presume that a legislature says in a statute what it means and means in a statute

11   what it says there.   When the words of a statute are unambiguous, then, this first

12   canon is also the last: judicial inquiry is complete."   *Id.* at 889, quoting *Connecticut*

13   *Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

14        While this Court may have distaste for the notion of suppression of the

15   Recording under the facts of this case, that should not preclude suppression.   *See*

16   *Gelbard v. United States*, 408 U.S. at 65 ("Here it is only necessary to adhere to the

17   basic principle that victims of unconstitutional practices are themselves entitled to

18   effective remedies.   For, 'where federally protected rights have been invaded, it has

19   been the rule from the beginning that courts will be alert to adjust their remedies so

20   as to grant the necessary relief.'"), quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946);

21   *See also United States v. Crabtree,* 565 F.3d at 890 ("We recognize, of course, that

22   the absence of a clean-hands exception to § 2515 could on occasion prevent the

23   government from obtaining a criminal conviction. There is no reason, however, for

24   us to presume that Congress was somehow unaware of this possibility.").

25        The history of Title III shows that it has real substance, it was not merely a

26   housekeeping, procedural matter that was squeezed into a larger bill.   The Act was

27   co-sponsored by both Hubert Humphrey and Barry Goldwater and it came at a time

28   of widespread national abhorrence at the realities of totalitarian governments, be

1   they German Fascist, Russian Stalinist, Chinese Maoist or Cuban Fidelista.  The

2   movement behind the Act grew from the recognition that a central feature of all of

3   these governments was the use of secret informants to cow the population into

4   subservience.   As a result, the statute bluntly states that no secretly-made

5   recordings may be used as evidence against an American citizen unless --

6          A) They were made by legitimate, court-supervised law enforcement, or

7          B)  They were innocently made.

8          This is not accidental.   The law has a significant purpose and intention.

9   Though in this case it is obviously -- indeed, ironically -- inconvenient to the

10  Government, it would be unfortunate if, in the give and take necessary to achieve a

11  just resolution, it were given short shrift.  It might in fact be a bit of judicial

12  legislation that the Court would presumably prefer to avoid.[8]   The statutory

13  language here is clear and unambiguous.  Given the extensive evidence showing

14  that Mr. Pellicano made the Recording as part of his record keeping activity in

15  furtherance of the criminal enterprise, this motion should be granted.

16     **D.     Similar to *Vest*, the Recording Should be Suppressed Because
           Mr. Pellicano Created it as a "Receipt" or Record**

17

18         Here, Mr. Pellicano has confirmed that he recorded his clients for

19  "inventory; for safekeeping; for, in effect, to remind himself of what he needed to

20  do." Ex. 2 to Neal declaration.  This was a criminal purpose as record keeping is a

21  function that furthers a criminal enterprise or conspiracy.  *See*, e.g., *United States v.*

22  *Smith*, 893 F.2d at 1575-78.

23         In *Vest,* Jesse Walters was arrested for shooting a police officer and then

24  released on bail.  Mr. Waters made a secret agreement with the officer he shot

25  (Tarantino) to pay $300,000 for his promise to help Mr. Waters avoid

26  imprisonment.  Officer Vest agreed to facilitate the payment.  When Mr. Waters

27

28

---

[8] Also true is that while the Government contends the Recording is evidence of a crime, it is also evidence of the cessation of a crime (fully five and a half years before the government knew anything about it).  We urge the Court, in balancing the scales in this matter, to bear that in mind.

116229/000001/1198522.02

1    met with Officer Vest to make payment he (Mr. Waters) secretly recorded the

2    transaction.   Mr. Waters subsequently turned over the tape to authorities and

3    Officer Vest was prosecuted.   *United States v. Vest*, 813 F.2d at 479.   After

4    Mr. Waters testified that he made the recording to create a "receipt" in the event

5    there was a dispute over the payment, the district court granted Officer Vest's

6    motion to suppress holding that the recording was made in violation of § 2515.

7    Specifically, the district court found that the "receipt" motive constituted an

8    impermissible purpose.   *United States v. Vest*, 639 F.Supp. 899, 907 (D.Mass.

9    1986).

10       Similarly, Mr. Pellicano recorded his clients as a form of receipt or record

11   keeping.   This is established by Mr. Pellicano's statement regarding his purpose

12   and by the statements and testimony of PIA's former employees.   *See* Exs. 2-8, 10-

13   17 to Neal declaration.   Additionally, Mr. McTiernan asks the Court to consider the

14   observable pattern whereby Mr. Pellicano consistently used his secret client

15   recordings to confirm his clients' financial obligations to him.   (*See,* e.g., Exs. 29-

16   31 to Neal declaration, trial transcript pages setting forth recordings of

17   Mr. Pellicano and Charles Lull, John McTiernan and Adam Sender, respectively).

18   Mr. Pellicano also repeatedly used the client recordings to extract a promise of

19   secrecy from clients to allow Mr. Pellicano to have control over the clients.   (*See*,

20   e.g., Exs. 32-35 to Neal declaration, trial transcript pages setting forth recordings of

21   Mr. Pellicano and Andrew Stevens, Chris Rock, Mark Cohn and Kenneth Starr,

22   respectively).

23       Without question, there is substantial evidence that Mr. Pellicano used

24   various forms of leverage to control his clients, command unconscionable fees and

25   protect the criminal enterprise.   The client recordings were an essential part of his

26   ability to achieve his criminal goals, and thus were made for a criminal purpose.   It

27   is significant that Mr. Pellicano did not record clients such as Bert Fields, whom he

28   trusted.   This further demonstrates that Mr. Pellicano's recording of specific clients,

116229/000001/1198522.02

1   such as Mr. McTiernan, was purposeful.

2           **E.**    **Mr. McTiernan's Motion to Suppress Materially Differs from Other Suppression Motions Brought by Mr. Pellicano's Alleged Co-Conspirators**

4         Mr. McTiernan anticipates that the Government may argue that this Court

5   has determined the issue presented by this motion by virtue of motions brought by

6   Terry Christensen.  However, there are several reasons why this Court's rulings as

7   to Mr. Christensen should not foreclose the granting of this motion.  As an initial

8   matter, substantially more evidence of Mr. Pellicano's criminal or tortious purpose

9   in recording his clients surfaced during Mr. Pellicano's two trials.  In addition,

10   Mr. Christensen was charged as Mr. Pellicano's co-conspirator and alleged to be an

11   active participant in their conspiracy.  Mr. McTiernan is not charged as a co-

12   conspirator and this distinction is of great importance.

13         In *United States v. Lam*, after defendant Mei Keng Lam was charged with

14   illegal gambling she moved to suppress taped telephone conversations of her bets

15   with the gambling operation.  The recordings were made by the bookie without Ms.

16   Lam's knowledge or consent (just as with Mr. McTiernan).  *United States v. Lam*,

17   271 F.Supp. 2d at 1184.  Ms. Lam relied primarily on *United States v. Vest*, arguing

18   that the bookie made the recordings "as a means of keeping business records for his

19   unlawful gambling activities."  *Id.*  In granting Ms. Lam's motion to suppress, the

20   district court expressly held that because Ms. Lam was not a co-conspirator she

21   could not be found to have given constructive consent to the decision of the bookie

22   to record their calls.  *Id.* at 1186.  Accordingly, the court distinguished between a

23   *customer* versus a *confederate*.

24         Here, the Government merely alleges that Mr. McTiernan was

25   Mr. Pellicano's client; conversely, the Government formally charged

26   Mr. Christensen with conspiracy and alleged that he was an attorney-intermediary

27   for his client Kirk Kerkorian.  Certainly, *Lam* has much stronger application to

28   Mr. McTiernan (a one time customer who had a single call unknowingly recorded)

22

116229/000001/1198522.02

1  than Mr. Christensen (an allegedly active player in the ongoing conspiracy with a

2  much higher volume of recorded calls).[9]  Mr. McTiernan did not have the requisite

3  conspiratorial involvement to give constructive consent to Mr. Pellicano to create

4  the Recording.  *Id.* ("While an individual's decision to record her telephone

5  conversations unlawfully could not sensibly be seen as a threat to her own privacy,

6  the same is not true of an unlawful recording by another party to the

7  conversation.").

8      **F.    Mr. Pellicano Recorded his Clients to Create Illegal Leverage
        Over Them and to Have Information to Trade/Sell to Tabloids**

9          Attached to the Neal declaration as Exhibit 36 is the FD-302 Report of Susan

10  Maguire, a former PIA client.  Ms. Maguire estimated that she paid Mr. Pellicano

11  $1 MM for his "work" on her divorce case.   Ms. Maguire learned that

12  Mr. Pellicano recorded his own calls, some of which he played for her.  She also

13  heard clicking sounds on her home phone.  However, she was intimidated by

14  Mr. Pellicano, who "told stories of intimidated [sic] people with a baseball bat,

15  killing animals, and would sometimes place a gun on a coffee table while talking to

16  Maguire."  *See* Ex. 36 to Neal declaration.  Ms. Maguire indicated that she was

17  scared of Mr. Pellicano and she even discussed the fear he caused her with a

18  therapist.  Despite her fear, she was unable to extricate herself from his contacts

19  and her own attorney told her it was in her best interest to stay on Mr. Pellicano's

20  good side.

21          In another example of Mr. Pellicano secretly recording his own client to gain

22  leverage over them, he secretly recorded his client John Gordon Jones, and when

23  the tapes proved exculpatory he refused to turn them over to Jones' legal team.

24  (*See* Ex. 37 to Neal declaration, Los Angeles Times article dated 3/17/06).

25  Additionally, Ex. 38 to the Neal declaration is a FD-302 Report for Ron Austin, a

26

27

28  ---
   [9]  It should also be noted that Mr. Pellicano recorded only one call with Mr. McTiernan.  Of
   course they spoke more than once as the Recording makes clear it is not an initial or introductory
   call.  This suggests that Mr. Pellicano made a purposeful decision to create the Recording.

1    former employee of attorney Richard Sherman (attorney for Mr. Jones).

2    Mr. Austin confirms that Mr. Pellicano, despite receiving $200,000 from Mr. Jones,

3    secretly "bugged" Mr. Jones' residence and then played "both sides" by discussing

4    the case with the LAPD.   This provides yet another example of Mr. Pellicano

5    recording his clients for his own illicit purposes or to create leverage against them,

6    purposes that are criminal and tortious.

7         Finally, attached to the Neal declaration as Ex. 39 is a transcript of recorded

8    conversations between Mr. Pellicano and a tabloid reporter named Jim Mitteager

9    showing that Mr. Pellicano was willing to trade information about his clients with

10   tabloid reporters.  Counsel for Mr. McTiernan is informed that the Government has

11   the Mitteager recordings but it has refused to produce them.  The Court should

12   compel production of the recordings and, at the very least, listen to them *in camera*

13   to determine their relevance to this motion to suppress.

14        Accordingly, the evidence shows that Mr. Pellicano not only used client

15   recordings to refresh his recollection concerning client activities.  He also used the

16   recordings as possible material to trade or sell to the tabloids.  It is more likely than

17   not that he made and retained client recordings in connection with his relationship

18   with the tabloid media.   Mr. Pellicano strategically released confidential client

19   information to promote himself or to cause others to fear his "connections."

20   Additionally, he was free to sell the recordings, trade them for information, or use

21   them to embarrass a client or former client who opposed him.  All of these reasons

22   for making the client recordings constitute criminal and tortious purposes.

23   **IV.   REQUEST FOR EVIDENTIARY HEARING**

24        **A.   Alternatively, if the Court is Not Inclined to Grant this Motion
           Based on the Evidence Submitted, Mr. McTiernan Respectfully
25         Requests an Evidentiary Hearing**

26        Whether an interception was made for the purpose of committing any

27   criminal or tortious act is a question of fact.  *United States v. Phillips*, 540 F.2d at

28   325.  Here, Mr. McTiernan's extensive offers of proof raise material, specific and

---

24

116229/000001/1198522.02

1   legitimate issues of fact that should be determined at an evidentiary hearing.  "A

2   party seeking to suppress [an intercepted communication] must be given a full and

3   fair opportunity to meet his or her burden of proof."  *Id.* at 326-27 (Matter

4   remanded to district court for evidentiary hearing); *See also United States v. Rose*,

5   526 F.2d 745, 749-750 (8th Cir. 1975).  Mr. McTiernan has met the threshold

6   showing requiring an evidentiary hearing.  *See United States v. Mavroules*, 813

7   F.Supp. 115, 121 (D. Mass. 1993)(granting evidentiary hearing to determine

8   whether conversation had been intercepted for the impermissible purpose of a

9   criminal or tortious act); *United States v. Nietupski*, 731 F. Supp. 881, 882 (C.D. Ill,

10  1990).

11      At an evidentiary hearing Mr. McTiernan would seek, at a minimum, to call

12  Mr. Pellicano as a witness to examine him as to his purpose in making the

13  Recording.  Additionally, Mr. McTiernan would seek to introduce live testimony

14  from former PIA employees and clients.  Among other things, Mr. McTiernan

15  would also seek to introduce the Mitteager recordings into evidence and/or to offer

16  live testimony regarding those recordings.

17  **V.     CONCLUSION**

18      Mr. McTiernan respectfully submits that the record establishes that it is

19  probable that Mr. Pellicano made the Recording for a criminal or tortious purpose.

20  Accordingly, the plain language of Title III requires that the Government be

21  precluded from using the Recording and the fruits of that communication.

22                                  Respectfully submitted,

23

24  DATED:  April 26, 2010              PROCOPIO, CORY, HARGREAVES &
                                        SAVITCH LLP
25

26                                  By: */s/ S. Todd Neal*
                                        S. Todd Neal
27                                      Attorney for Defendant
                                        JOHN McTIERNAN
28

---

25